**Southern DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                        CRIMINAL NO. 5:11-cr-1-DCB-FKB

**JUAN CARRASCO-SANCHEZ and**
**ORLANDO QUINTANA ROJANO**


**OPINION AND ORDER**

This cause comes before the Court on Defendants' Joint Motion to Suppress [docket nos. 31, 33]. Having carefully considered the Defendants' Motion, the Government's response thereto, the testimony given at the hearings, applicable statutory and case law, and being otherwise fully advised in the premises, this Court finds and orders as follows:

**I. Facts and Procedural History**

Defendants Carrasco-Sanchez ("Sanchez") and Rojano were arrested on March 2, 2011 by Officers of the Vicksburg Police Department. The Defendants were arrested following a routine traffic stop for speeding and a search of their vehicle revealed ninety-one credit cards hidden in the vehicle's dashboard. The Defendants were then charged with possession of fifteen or more counterfeit or unauthorized access devices with intent to defraud, in violation of 18 U.S.C. § 1029(a)(3). The Defendants have moved to suppress all evidence recovered in the search of the vehicle, and this Court held hearings on that Motion on June 9, 2011 and August 12, 2011.

The underlying facts of the search are as follows. On March 2,

2011, Officer Young of the Vicksburg Police Department stopped the Defendants on Interstate 20 for speeding. The Defendants were driving a 2008 Dodge Caravan that had a paper tag. After pulling the car over, Young approached the vehicle and asked the driver, Sanchez, for his licence and the van's registration. Sanchez handed Young his licence and rental invoice for the van, and Young returned to his patrol car. Upon inspection of the rental agreement, Young noticed that the vehicle the Defendants were driving did not match the vehicle on the rental agreement, which was listed as a 2011 Chrysler Town and Country. Further, the invoice appeared to have been printed from a computer and was unlike other rental contracts Young had seen.[1] Suspicious of the contract's validity, Young immediately radioed for backup. Officer Young testified that he then called the number on the rental agreement to investigate the contract's discrepancy but no one from the rental company answered his phone call.[2] Young also ran a computer check on Sanchez's licence but claimed that he did not initiate a check on the paper tag because, in his experience, it

---

[1] At the hearing, Young testified that the rental contract had "Windows Live" printed at the top of the paper, which made him particularly suspicious. Nevertheless, the Court observed Officer Young and finds him to be a credible witness.

[2] At the second hearing, the Defendant's introduced Officer Young's cell phone records that indicate that he did not use his cell phone to call the rental company after he returned to his patrol car. They also introduced evidence which indicates that Young initiated an investigation into the paper tag, contrary to his testimony in court.

was unlikely to return any relevant information.

Shortly thereafter, Sergeant Troy Kimble of the Vicksburg Police Department arrived, and Young returned to the van to question Sanchez about the paperwork and his destination.  Sanchez responded that the passenger, Rojano, had rented the vehicle and said they were traveling to Denver to attend his daughter's graduation. He also claimed to have known Rojano for about five years. While questing Sanchez, Young noticed oranges in the car, which, based on his training, he knew were often used as making agents for illegal drugs. At that point, Young requested Sanchez's permission to search the vehicle and Sanchez consented, telling Officer Young that there was nothing illegal in the vehicle. Young asked Sanchez to exit the vehicle and patted down Sanchez for weapons. Sanchez consented to the van's search approximately five minutes after the initial stop.

Young then moved to the other side of the vehicle to question Rojano about the van. While verifying the paperwork, Officer Young inquired about their destination and his relationship with Sanchez. Rojano stated that they were traveling from Miami to Denver but gave a different reason for the trip. Further, he claimed that he had only known Sanchez for a few weeks. Officer Young informed Rojano that Sanchez had consented to a search of the van and asked Rojano whether he had any problem with the search.  Rojano did not voice any objection and similarly gave his consent. After Rojano

joined Sanchez at the rear of the van, Officer Young proceeded to search the vehicle.[3]

The video of the arrest shows that Officer Young searched the van for approximately fifteen seconds, but, before starting his search in earnest, he returned to the back of the van to reiterate to Rojano that he was searching the van. Again, it was Sanchez who responded that there was nothing in the vehicle for him to find and that Officer Young could proceed. Young renewed his search of the vehicle. Approximately eight minutes elapsed between the time Young stopped the vehicle and the beginning of his search.

Young immediately found two missing screws and a screwdriver on the floorboard of the van. He also discovered a large quantity of oranges hidden under the floorboard on both the driver's and passenger's side of the vehicle. Young testified that he was seeking to find the location of the missing screws but was unsuccessful. Young ran his hand along the dashboard directly above the radio looking for a hidden void. He lifted this part of dashboard, which popped up, and found four stacks of credit cards, totaling ninety-one cards, in the recess of the dashboard. Officer Young questioned the Defendants about the cards, but they both denied having any knowledge of them. Young then placed the Defendants under arrest. The entire search lasted approximately

---

[3] It is unclear from the testimony before the Court whether the rental agreement provided by the Defendants was, in fact, a valid rental agreement.

twenty-five minutes. Following the Defendants' arrest, the Vicksburg Police Department impounded the vehicle. The Government searched the vehicle the next day and discovered another 106 credit cards hidden in the van's dashboard.

The Defendants now move to suppress all the evidence recovered from their van as the product of an illegal search. The Government concedes that its inventory search was unlawful and only seeks to introduce into evidence the credit cards discovered by Officer Young. In their Motion, the Defendants offer two reasons why the evidence discovered by Officer Young should be suppressed: (1) the extension of the stop to search the vehicle violated the Defendants' Fourth Amendment rights, and (2)the Defendants' consent was not voluntarily and freely given.

## II. Analysis

**1. Whether Officer Young Had A Reasonable Suspicion to Extend the Initial Traffic Stop**

The Supreme Court articulated a two-part inquiry for analyzing the legality of traffic stops in Terry v. Ohio. See United States v. Pack, 612 F.3d 341, 350-51 (5th Cir. 2010)(citing Terry, 391 U.S. 1 (1968)). First, the court must consider whether the initial traffic stop was justified. Pack, 612 F.3d at 350 (citation omitted). Secondly, the court must determine whether the officer's subsequent search of the vehicle was reasonably related in scope to the reason the officer stopped the vehicle in the first place. Id. (citation omitted). However, if the officer develops a reasonable

suspicion of additional criminal activity during his lawful investigation, the officer may further detain the suspects for a reasonable time in order to dispel this suspicion. Id. The Defendants argue that the constitutionality of the Government's search fails under second-prong of the Terry analysis because Officer Young failed to develop a reasonable suspicion of additional criminal activity during his investigation of the initial traffic violation.

"[A] search is not reasonably related to the circumstances justifying a traffic violation stop when the search in question occurs after the time required for an officer to issue a citation (or to decide against doing so) and to complete a 'computer check' for outstanding warrants and vehicle theft." United States v. Cavitt, 550 F.3d 430, 436 (5th Cir. 2004). When investigating a traffic stop, an officer may (1) request a driver's licence, insurance papers, and vehicle registration, (2) run a computer check and issue a citation, and (3) detain and question the subjects of a traffic stop during the time a computer check is being conducted. Id. (citing United States v. Santiago, 310 F.3d 336, 341-42 (5th Cir. 2000)).

In order to extend the stop beyond the scope of the initial investigation, an officer must develop a reasonable suspicion that "criminal activity [is] afoot". Pack, 612 F.3d at 355 (citing United States v. Arvizu, 534 U.S. 273 (2002)). An officer's

6

suspicion is deemed reasonable if he can identify particular evidence that suggests that a crime has been committed. Id. at 355 (citing Brown v. Texas, 443 U.S. 47, 51 (1979)). The reasonableness of the prolonged detention is measured in objective terms based on the totality of the circumstances. United States v. Escareno-Sanchez, 507 F.3d 877, 882 (5th Cir. 2007), vacated on other grounds, 553 U.S. 1029 (2008).

In the instant case, the underlying facts, when considered together, created a reasonable suspicion for Officer Young to extend the stop beyond the time necessary to issue the Defendants a traffic citation. Two circumstances in particular justified a prolonged stop.[4] First, the rental invoice listed the rental vehicle as a 2011 Town and Country, which did not match the 2008 Dodge Caravan the Defendants were driving. Upon closer inspection, it appeared to Officer Young that the invoice had been printed off the internet, unlike any other agreement that he had encountered. Officer Young testified at the first hearing that the contract did

---

[4] There is some question as to whether the presence of oranges triggered Officer Young's suspicion that there might be drugs in the van. Officer Young testified that, upon his first inspection of the vehicle, he noticed oranges and concluded that "something just [didn't] feel right." Further, he testified that oranges are often used as masking agents for drugs. When specifically asked, however, whether his discovery of oranges in the van's floorboard alerted him to the possible presence of drugs, he stated that he did not have a reasonable suspicion that drugs were present; instead, he claimed the large quantity of oranges in the floorboard simply appeared "odd." Because Young's testimony was equivocal on this point, the Court will not factor this unusual circumstance into its Terry-stop analysis.

not seem to be "legit" and became suspicious that the Defendants were not legally in possession of the vehicle. Based on that initial suspicion, Officer Young returned to the van to question the Defendants about the discrepancy between the van listed on the contract and the van the Defendants were driving.

Secondly, when Officer Young questioned Sanchez about his ultimate destination and his relationship with Rojano, Sanchez stated he had known the Defendant for five years and claimed that they were traveling to Denver for his daughter's graduation. Rojano, on the other hand, gave a different explanation for the trip and claimed that he had only been acquainted with Sanchez a few weeks. The conflicting stories as to the Defendants' destination alone would not give rise to a reasonable suspicion. However, the widely divergent responses concerning the length of the Defendant' relationship was sufficient to arouse a reasonable suspicion that the Defendants had something to hide. In contrast to the Defendants' inconsistent stories in Jones, Santiago, and Estrada that the Fifth Circuit deemed "too minor and insignificant to give rise to any reasonable suspicion of *any* criminal activity," Young was justified in concluding from the Defendants' responses that criminal activity was afoot. Pack, 612 F.3d at 360 (emphasis in original); see United States v. Estrada; 459 F.3d 627 (5th Cir. 2006); United States v. Jones, 234 F.3d 234 (5th Cir. 2000); United States v. Santiago, 310 F.3d 336 (5th Cir. 2002).

Finally, only five minutes had elapsed before Officer Young obtained consent from Sanchez to search the vehicle. While this relatively short length of time is not dispositive, it was not an unreasonable amount of time for Young to investigate the initial traffic violation. Officer Young was in the process of dispelling his concerns about the paperwork, which arose during his initial traffic stop, and was well within bounds to return to the vehicle to question the van's occupants about the obvious inconsistency in order to satisfy his concerns. When he did so, the Defendants provided conflicting information about their relationship. Taken together, the faulty paperwork followed by the Defendants' inconsistent stories naturally raised a reasonable suspicion as to whether the Defendants legally possessed the vehicle. Therefore, this Court finds that Young's decision to request permission to search the vehicle upon developing a reasonable suspicion of criminal activity did not violate the Defendants' Fourth Amendment rights.

**2. Whether the Defendants' Consent To Search the Car Was Voluntary.**

A search may not constitute a Fourth Amendment violation "even when reasonable suspicion does not justify the search." Cavitt, 550 F.3d 430, 438 (5th Cir. 2008). Furthermore, "consensual encounters 'do not implicate Fourth Amendment concerns,' and 'a consensual interrogation may follow the end of a valid traffic stop.'" Id. (citing United States v. Brigham, 382 F.3d 500, 508 (5th Cir.

2004)).

The Defendants do not contest the fact that they consented to Officer Young's search of the vehicle; instead, they claim their consent was involuntarily and a product of their illegal detention. See Santiago, 310 F.3d at 343. Whether the Defendants voluntarily consented is a question of fact that must be determined by the totality of the circumstances. Cavitt, 550 F.3d at 439. Courts are to consider six specific factors when determining whether consent was voluntary, although no single factor is dispositive. Id. (citing United States v. Jenson, 462 F.3d 399, 406 (5th Cir. 2006)).

(1) *The voluntariness of the Defendants' custodial status*. The Defendants argued at the second hearing that because Officer Young maintained possession of their licence and rental agreement as he was asking for their consent, their custodial status was not voluntary. The Court finds that, for the reasons stated above, the Defendants were not detained beyond a reasonable time necessary for Officer Young to satisfy his concerns about the paperwork and the inconsistent stories they provided. Young was in the process of dispelling his own suspicion about the rental agreement when he asked Sanchez if he could search the vehicle. Similarly, Young obtained Rojano's consent as he contemporaneously verified the information on the rental contract.

Taking into account Officer Young's reasonable suspicion of the

contract's authenticity and the fact that Sanchez consented to the search within five minutes of the initial stop, the circumstances do not suggest that the Defendants' consent was a product on their custodial status. Brigham, 382 F.3d at 511 (holding that officers must "diligently pursue[] a means of investigation . . . likely to confirm or dispel their suspicions quick" but are not timed by a "constitutional stopwatch").

(2) *The presence of coercive police procedures*. Here, the Defendants do not allege, and neither is their evidence to indicate, that Officer Young coerced the Defendants into giving their consent. Based on the video evidence of the traffic stop, Sanchez appears to have given his consent without much prompting by Officer Young. Similarly, Rojano did not protest Young's request to search the vehicle. The fact the Officer Young requested permission to search the vehicle a third time, shortly after beginning the search, demonstrates the care Young took in order to ensure that their consent was a product of their free-will.

(3) *The extent and level of the Defendants' cooperation with the police*. Again, both Sanchez and Rojano, at all times, complied with Officer Young's requests. When Officer Young first asked Sanchez if he could search the van, Sanchez immediately consented and complied with Officer's Young's request to exit to the back of the van so he could proceed. Rojano, for his part, voiced no objection to the search and seemed content to join Sanchez at the rear of the

11

vehicle. Neither of the Defendants gave any verbal or physical indication of a desire to refuse, and in fact, Sanchez twice responded that they had nothing to hide. By all indications, the Defendants were compliant.

(4) *The Defendants' awareness of their right to refuse consent.* The Defendants challenge the voluntariness of their consent under this prong, claiming that (1) Officer Young never informed them of their right to refuse and, had he done so, (2) they would not have been unable to understand him because of their difficulty with English. The Court recognizes that Young did not articulate to the Defendants that they had a right to refuse; however, the Court does not find merit in the Defendants' claim that they failed to comprehend that Young was seeking their permission to search their vehicle.

Officer Young asked the Defendants three times for permission to search the vehicle. Again, the video evidence clearly depicts Officer Young asking permission from Sanchez to search their vehicle. Nothing from his demeanor on the videotape suggests that Young was pressuring Sanchez into consenting. Similarly, Rojano appeared to understand that Sanchez had given his permission to search the van and also consented Young's request. Further, before he began searching the vehicle, Officer Young returned to the Defendants to once again seek their permission. The Defendants could have reasonably inferred from his actions that they had a

right to refuse his last request. Nevertheless, Sanchez showed no hesitation about affirming his original permission—he stated, for the second time, that he believed Officer Young would find nothing illegal.

(5) *The Defendants' education and intelligence*. The Defendants' particular level of education is not part of the record. It is arguable whether the Defendants' inability to speak English weighs in their favor. At the hearing, Defendant Rojano requested the use of an interpreter to understand the court proceedings. The Court notes, however, that Officer Young testified that the Defendants had no difficulty communicating with him. And more importantly, as stated in the fifth factor, the video evidence suggests that the Defendants appeared to adequately comprehend Officer Young's request and also comported themselves in a manner consistent with an intelligent and reasonable person.

(6) *The Defendants' belief that no incriminating evidence will be found*. During the entire stop, the Defendants appeared restless but not necessarily unnerved by the stop. Their behavior does not indicate either way whether they actually believed Officer Young would find credit cards hidden in the dash. Sanchez, however, twice consented to Officer's Young's search, both times asserting that his search would be fruitless. These two statements, coupled with Sanchez's relatively unconcerned demeanor under the circumstances, are enough to indicate that Sanchez did reasonably believe that no

13

incriminating evidence would be found.

After considering the following six factors, the Court finds that the Defendants voluntarily consented to Officer Young's search of the van, and therefore, Officer Young's subsequent search did not violate the Defendants' Fourth Amendment rights. Accordingly, all evidence recovered during Officer Young's search of the van is admissible. Because the Government concedes that the inventory search following the impoundment of Defendants' vehicle was unlawful, the Court grants the Defendants' Motion to Suppress the 106 credit cards recovered during that search.

### III. Order

**IT IS HEREBY ORDERED** that the Defendants' Joint Motion to Suppress [docket entry nos. 31, 33] are **GRANTED** in part and **DENIED** in part.

**SO ORDERED,** this the 8th day of September 2011.

/s/David Bramlette
_____
UNITED STATES DISTRICT JUDGE